O

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **LOGICLINK, INC.,** | ) | **Case No. SA CV07-1056-DOC(MLGx)** |
| **Plaintiff(s),** | ) | |
| | ) | **O R D E R** FINDINGS OF FACT |
| **v.** | ) | AND CONCLUSIONS OF LAW |
| | ) | |
| **KEYLINK SERVICE SOLUTIONS,** | ) | |
| **INC.; ROBERT BASULTO; and** | ) | |
| **DOES 1 to 10** | ) | |
| **Defendant(s).** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

Pursuant to Plaintiff Logiclink, Inc.'s ("Plaintiff") waiver of jury trial, the Court has conducted a five day bench trial. Defendants Keylink Service Solutions, Inc. and Robert Basulto ("Defendants") filed their trial briefs and supporting declarations on December 31, 2008. Plaintiff filed a trial brief and supporting exhibits on October 21, 2008.  Both parties filed supplemental briefing, including Revised Proposed Findings of Fact and Conclusions of Law on January 12, 2009 and February 2, 2009.  Having considered the submissions by the parties and all admissible evidence, the Court hereby enters its Findings of Fact and Conclusions of Law in conformity with Federal Rule of Civil Procedure 52.

**FINDINGS OF FACT**

1.   Logiclink, Inc. ("Logiclink") is the assignee of U.S. Patent No. 5,987,498 (the "'498 Patent"), which was filed on February 16, 1996 in the United States Patent and Trademark Office (the "USPTO").

2.   The '498 Patent was issued on November 16, 1999.

3.   The '498 Patent was assigned to Logiclink on May 22, 2002 per a bankruptcy court order and recorded in the USPTO.

4.   The '498 Patent expired on November 17, 2003 and was reinstated on August 10, 2005.

5.   Kim Kao is the president of Logiclink, a Michigan corporation qualified to do business in California.

6.   Defendant Robert Basulto ("Basulto") worked for Logiclink from August 27, 2003 to July 5, 2004.

7.   Keylink Solutions, Inc. ("Keylink") was formed during Basulto's employment with Logiclink.

8.   Keylink was incorporated on November 18, 2004.

9.   Basulto conducted business with Keylink as early as July 7, 2003 and is presently the president, secretary and director of Keylink.

10.   Logiclink replaces, sells and services automated business service centers, kiosk workstations and WiFi services to the hospitality industry.

11.   Keylink replaces, sells and services automated business service centers, kiosk workstations and WiFi services to the hospitality industry.

12.   While Basulto was working as Vice President of Logiclink he began to form Keylink in order to sell and maintain automated business centers.

13.   Basulto, while employed at Logiclink, actively competed with Logiclink and diverted potential customers of Logiclink for his own personal gain.

14.   Basulto diverted the following hotels in Nevada for his own personal gain: Mandalay Bay, New York New York, Treasure Island, Stratosphere, Flamingo HGVC, Flamingo Hotel, Hilton HGVC No. 2, Monte Carlo, Golden Nugget, MGM Signature, Belagio, Harrah's Lauglin, Riviera.

2

15. Basulto signed a Logiclink non-disclosure and confidentiality agreement on August 29, 2003. (Trial Exhibit 4).

16. Basulto signed a Logiclink dba Business Automated Center @ Hotel Non-Disclosure and Confidentiality exhibit. (Trial Exhibit 5).

17. Basulto agreed not to interact or interface with any competitors or competitive companies without the express, written pre-approval of Logiclink's upper management.

18. Basulto did not receive any written pre-approval from the upper management of Logiclink to interface or interact with any competitors or competitive companies.

19. For calendar year 2005, Keylink's gross sales from its operation of automated business centers, workstations and WiFi services was $107,739.00.

20. For calendar year 2006, Keylink's gross sales from its operation of automated business centers, workstations and WiFi services was $1,002,826.00.

21. For calendar year 2007, Keylink's gross sales from its operation of automated business centers, workstations and WiFi services was $1,685,070.00.

22. From January through July of 2008, Keylink's gross sales from its operation of automated business centers, workstations and WiFi services was $1,297,958.67.

23. As an employee of Logiclink, Basulto received wages, commissions and expense reimbursements from Logiclink totaling $72,272.67.

24. On August 31, 2005, Basulto and Keylink were given notice from Logiclink that they were interfering with Logiclink's '498 Patent.

25. Keylink did not receive authorization from Logiclink to use the elements of the '498 Patent Claims.

26. Evidence has not been presented proving that Keylink is in direct control of Kiosklogix's Netstop Software.

27. The '498 Patent Claims 1, 18, 19 and 28 are independent claims.

28. The '498 Patent Claim 1 consists of the following elements:

    1.A  Provides a method of communication between a remote site computer and a content provider using a central server and displaying advertising at the remote site, comprising

1    of the steps of:

2    1.B Initiates a log on session at the remote site computer;

3    1.C Collects identification information from a user at the remote site computer;

4    1.D Communicates the user identification information from the remote site computer to

5    the central server;

6    1.E Retrieves user configuration information from the central server to the remote site

7    computer, based on the user identification information;

8    1.F The central server communicates with said content provider based on the user

9    identification information and the user configuration information;

10   1.G Terminates the log-on session;

11   1.H Displays the session charge information and said advertising on said remote site

12   computer;

13   29.   Keylink does not practice elements 1.D, 1.E or 1.F of Claim 1 (as explained below).

14   30.   The '498 Patent Claim 18 consists of the following elements:

15   18.A Provides a method of operating a server computer of a network, to which are

16   connected a plurality of computer terminals.  The method comprises the steps of:

17   18.B Receiving a first set of user information at the control computer from a first user at

18   one of the computer terminals sufficient to identify a user account to be debited for billing

19   purposes;

20   18.C Verifying the first set of user information for authorization and beginning a network

21   log-on session by the first user;

22   18.D Retrieving a second set of user information from a storage device in communication

23   with the server computer, the second set of user information including user account

24   information from the first user;

25   18.E Establishing communication between the first user computer and one or more

26   network service providers in accordance with information selected from a group

27   including the first set of user information and the second set of user information;

28   18.F Providing user account information to each respective network service provider;

4

18.G Receiving data from the network service providers for presentation to the first user;

18.H Finding the network log-on session;

18.I Transmitting user configuration information from the first user computer to the server computer and displaying session charge information at the first computer.

31.   Keylink does not practice elements 18.D, 18.E, 18.F, 18.G or 18.I of Claim 18 (as explained below).

32.   The '498 Patent Claim 19 consists of the following elements:

19.A Provides a method of operating a server computer of a network, to which are connected a plurality of computer terminals, the method comprising the steps of:

19.B Receiving a set of user information as to the control computer from a first user at one of the computer terminals sufficient to identify a user account to be debited for billing purposes;

19.C Verifying the first set of user information for authorization and beginning a network log-on session by the first user;

19.D Retrieving a second set of user information from a storage device in communication with the server computer, the second set of user information including user account information for the first user;

19.E Establishing communication between the first user computer and one or more network service providers in accordance with information selected from a group including the first set of user information and the second set of user information;

19.F Providing user account information to each receptive network service provider;

19.G Receiving data from network service providers for presentation to the first user;

19.H Ending the network log-on session;

19.I Transmitting user configuration information from the first user computer to the server computer and displaying session charge information at the first computer;

19.J Providing communication between said remote site computer and a plurality of content providers using the central server;

19.K The step of retrieving user information includes retrieving user information

1  pertaining to each of said content providers;

2  19.L The steps of the central server communicating, comprises the central server

3  communicating with each of said content providers based on user configuration

4  information pertaining to the respective content provider.

5  33.  Keylink does not practice elements 19.D, 19.E, 19.F, 19.I, 19.J and 19.L of Claim 19 (as

6  explained below).

7  34.  The '498 Patent Claim 28 is comprised of the following elements:

8  28.A An apparatus providing communication between a remote site computer and a

9  content provider using a central server.  The apparatus comprises of:

10  28.B A means for communicating user identification information from the remote site

11  computer to the central server and beginning a log-on session;

12  28.C A means for retrieving user configuration information from the central server, based

13  on the user identification information;

14  28.D A means for the central server to communicate with said content provider based on

15  the user identification information and the user configuration information;

16  28.E A means for terminating the log-on session;

17  28.F A means for displaying the advertising and session charge information on said

18  remote computer.

19  35.  Keylink does not practice elements 28.B, 28.C, or 28.D of Claim 28 (as explained below).

20  36.  Keylink does not infringe the '498 Patent under the Doctrine of Equivalents.

21

22

23  **CONCLUSIONS OF LAW**

24  **Patent Infringement**

25  37.  The patent owner bears the burden of proving infringement by a preponderance of the

26  evidence.  *See e.g., LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc*., 275 F.3d 1347,

27  1356 (Fed. Cir. 2001).  In assessing whether a patent is being infringed, only independent

28  claims need to be examined since claims that depend on one another can only be infringed

1    if there is infringement of the claim upon which they depend.  In this case, the parties

2    have stipulated that the independent claims in the '498 Patent are claim numbers 1, 18, 19

3    and 28.

4    38.    An infringement analysis is a two-step process.  First, the scope of the claim must be

5    determined.  This step, often referred to as "claim interpretation", is an issue of law

6    exclusively within the province of the courts.  *E.g., Markman v. Westview Instruments,*

7    *Inc.*, 517 U.S. 370 (1996); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1453 (Fed.

8    Cir. 1998)(en banc).  In the second step, the properly construed claims are compared to

9    the accused product or process to determine whether those claims "read on" the accused

10    subject matter.  Said differently, the court determines as a matter of fact whether all of the

11    claim limitations are present in the accused device, either literally or by a substantial

12    equivalent.  *See e.g., Johnson Worldwide Assocs., Inc. v. Zebco Corp*, 175 F.3d 985, 988

13    (Fed. Cir. 1999).  In order for a court to find infringement, "the plaintiff must show the

14    presence of every element or its substantial equivalent in the accused device."  *Wolverine*

15    *World Wide v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994)(citing *Perkin-Elmer Corp.*

16    *v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532-33 (Fed.Cir.1987)).

17    **Claim Construction**

18    39.    In making its claim construction findings, where "the ordinary meaning of claim language

19    ... is readily apparent even to lay judges," a court looks at the language of the claims

20    themselves and thereby attempts to discern their ordinary and customary meaning.

21    *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-14 (Fed. Cir. 2005).  There is a "heavy

22    presumption in favor of the ordinary meaning of claim language." *Johnson Worldwide*,

23    175 F.3d at 989.  However, if no ordinary and customary meaning is readily apparent, the

24    court must determine the more technical meaning in a field of art.  *Id.*  In so doing, the

25    court looks to "those sources available to the public that show what a person of skill in

26    the art would have understood disputed claim language to mean."  *Phillips*, 415 F.3d at

27    1314 (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d

28    1111, 1116 (Fed. Cir. 2004)).  Those sources include, in order of importance, 'the words

1  of the claims themselves, the remainder of the specification, the prosecution history, and

2  extrinsic evidence concerning relevant scientific principles, the meaning of technical

3  terms, and the state of the art." *Id.* (citing *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade*

4  *Comm'n*, 383 F.3d 1352, 1364 (Fed.Cir.2004)); *see also Abbott Labs.v. Andrx Pharms.,*

5  *Inc.*, 473 F.3d 1196, 1209 (Fed. Cir. 2007); *MBO Labs., Inc. v. Becton, Dickson & Co.*,

6  474 F.3d 1323, 1329 (Fed. Cir. 2007).

7  40.  After considering the plain meanings of the claim terms of the '498 Patent – as

8  understood by persons of ordinary skill in the art and as portrayed by the intrinsic

9  evidence in this case – this Court makes the following conclusions of law with regard to

10  the interpretation of four key terms in the '498 Patent:

11  41.  The term "**central server**" – as used in the '498 Patent – means "a device through which

12  the remote terminal accesses the internet and stores userID/password and configuration

13  information for future use by the user."

14  42.  The term "**user configuration information**" – as used in the '498 Patent – means

15  "information associated with the user such as the user's account information, email

16  information, screen formats, or screen colors."

17  43.  The term "**user identification information**" – as used in the '498 Patent – means "a

18  user's given name or a system user name specially coined by the user that is used to

19  identify the user in each transaction."

20  44.  The phrase "**the central server communicating with said content provider**" – as used

21  in the '498 Patent – means "the central server providing information to or receiving

22  information from said content provider."

23  **Infringement**

24  45.  Literal infringement occurs when "all of the elements of the claim, as correctly construed,

25  [are] present in the accused device." *See, e.g., TechSearch, LLC v. Intel Corp.*, 286 F.3d

26  1360, 1371 (Fed. Cir. 2002)(citing *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 532

27  (Fed.Cir.1996)).  A patent is infringed if any of its claims are infringed because "each

28  claim is a separate statement of a patented invention." *Pall Corp. v. Micron Separations,*

1    *Inc.*, 66 F.3d 1211, 1220 (Fed. Cir. 1995).

2    46.    In some cases, infringement may also be shown by indirect infringement under 35 U.S.C.

3           § 271(c)("Whoever offers to sell or sells within the United States or imports into the

4           United States a component of a patented machine, manufacture, combination or

5           composition, or a material or apparatus for use in practicing a patented process,

6           constituting a material part of the invention, *knowing the same to be especially made or*

7           *especially adapted for use in an infringement of such patent*, and not a staple article or

8           commodity of commerce suitable for substantial noninfringing use, shall be liable as a

9           contributory infringer.")(emphasis supplied).

10   47.    Under the Doctrine of Equivalents, a product or process that does not literally infringe

11          upon the express terms of a patent may, nonetheless, be found to infringe if there is

12          equivalence between the elements of the accused product or process and the claimed

13          elements of the patented invention.  *Warner-Jenkinson Co. v. Hilon Davis Chem. Co.*,

14          520 U.S. 17, 21, 117 S. Ct. 1040 (1997).  Equivalents may be demonstrated by showing

15          that an element in the accused process performs "substantially the same function in

16          substantially the same way to obtain the same result" as the claimed invention.  *Graver*

17          *Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854

18          (1950)(citing *Sanitary Refrigerator Co v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9 (1929)).

19   48.    Plaintiff has not proven that the Keylink product infringes claims 1, 18, 19 and 28 of the

20          '498 patent either directly, indirectly or under the doctrine of equivalents.  This is largely

21          due to the fact that the accused product lacks a central server, as defined in the '498

22          Patent, and does not collect user configuration information and email data nor save

23          changed configuration data.

24   49.    For the foregoing reasons, Keylink does not practice elements 1.D, 1.E or 1.F of Claim 1.

25          1.D: Keylink does not "communicat[e] user identification information from the remote

26          site computer to a central server," as required by element 1.D.  Keylink's business method

27          does not involve communicating user identification information outside of credit card

28          numbers.  Further, said credit card numbers are not processed by either Keylink's server

1    or Kiosklogix's server.  Instead, the relevant credit card numbers are sent by the remote

2    computer to a third party credit card processor.

3    1.E: Keylink's business method does not involve "retrieving user configuration

4    information from the central server to the remote site computer, based on the user

5    identification information," as required under element 1.E.  In the Keylink product, user

6    configuration information is not stored at the central server (thus preventing it from being

7    communicated from the central server to the remote site computer).  Further, user

8    identification information is not passed to the central server.

9    50.   For the foregoing reasons, Keylink does not practice elements 18.D, 18.E, 18.F, 18.G or

10          18.I of Claim 18:

11    18.D: Keylink does not "retriev[e] a second set of user information from a storage device

12    in communication with the server computer, the second set of user information including

13    user account information for the first server," as required by element 18.D.  As noted

14    previously, under Keylink's business method, only credit card information is sent and this

15    information is sent by a remote computer directly to a third party credit card processor.

16    That is, even a user's credit card information is not sent to a Keylink central server.

17    Further, there is no storage device in communication with the server computer, and no

18    user information is stored beyond the duration of the user's session.  When the user logs

19    out, all changes made by the user are removed from the computer (*i.e*., Keylink uses the

20    "virtualization" technique).

21    18.E & 18.F: Keylink does not "establish[] communication between the first user

22    computer and one or more network service providers in accordance with information

23    selected from a group including the first set of user information and the second set of user

24    information," as required by element 18.E.  Further, Keylink does not "provid[e] user

25    account information to each respective network service provider" as required by element

26    18.F. The Keylink product does not send any user information to any network service

27    providers.  Therefore, the Keylink product need not – and does not – obtain, store or

28    communicate user information.  Keylink's own account information is used to purchase

internet access, and no Keylink relationship exists with other service or content providers.

18.G: Keylink does not "receiv[e] data from the network service providers for presentation to the first user," as required by element 18.G.  Keylink only provides an internet browser and internet access by renting computer time to the user.  The service provider, using its website, handles any and all user identification and configuration information.

18.I: Keylink does not "transmit[] user configuration information from the first user computer to the server computer and display[] session charge information at the first computer," as required by element 18.I.  In the Keylink product, configuration information is transmitted directly to the content provider without passing through the Keylink server.

51.   For the foregoing reasons, Keylink does not practice elements 19.D, 19.E, 19.F, 19.I, 19.J or 19.L of Claim 19:

19.D: Keylink does not "retriev[e] a second set of user information from a storage device in communication with the server computer, the second set of user information including user account information for the first user," as required by element 19.D.  Keylink does not utilize a storage device in communication with a server computer nor store user information beyond the duration of a user's session.  The Keylink server only rents computer time to users.  Further, when a Keylink computer rental session ends, all changes made by the user are removed from the remote computer and the charge account number is removed from the server computer.

19.E & 19.F: Keylink does not "establish[] communication between the first user computer and one or more network service providers in accordance with information selected from a group including the first set of user information and the second set of user information," as required by element 19.E.  Keylink also does not "provid[e] user account information to each respective network service provider," as required by element 19.F.  Keylink does not send user information to network service providers.  The remote computers are connected to the internet through a service billed to Keylink rather than the

user.

19.I, 19.J & 19.L:  Keylink does not "transmit[] user configuration information from the first user computer to the server computer and display[] session charge information at the first computer," as required by element 19.I.  Keylink also does not "provide[] communication between [a] remote site computer and a plurality of content providers using [a] central server," as required by element 19.J.  Neither does Keylink have a central server that "communicat[es] with various content providers based on user identification information pertaining to the respective content provider," as required by element 19.L.  Again, Keylink does not store user configuration information at the central server.  Instead, each content provider has their own server and is directly connected to the user at a remote computer through the internet rather than a Keylink central server.  Further, the remote computers are connected directly to the internet through an internet service provider billed to Keylink.

52.   For the foregoing reasons, Keylink does not practice elements 28.B, 28.C, or 28.D of Claim 28:

28.B, 28.C & 28.D.  Keylink does not provide a "means for communicating user identification information from the remote site computer to the central server and beginning a log-on session," as required by element 28.B.  Neither does Keylink provide a means for "retrieving user configuration information from the central server, based on the user identification information," as required by element 28.C.  Finally, Keylink does not provides a means for "the central server to communicate with [a] content provider based on the user identification information and the user configuration information," as required by element 28.D.  As stated, Keylink's server does not receive user identification information.  Further, Keylink's server only processes billing information, not user configuration information.  Finally, Keylink's server does not communicate with content providers; all communication with content providers is from the remote computer itself.

53.   Because Keylink has not infringed the '498 Patent, the Court need not make a determination as to whether (1) the '498 Patent is invalid due to, *inter alia*, obviousness

1   or anticipation, or (2) whether the '498 Patent is unenforceable due to misuse.  Further,

2   Defendants cannot be found to have induced infringement of the '498 Patent,

3   contributorily infringed the '498 Patent, or acted in reckless disregard for Logiclink's

4   '498 Patent rights.

5   **Unfair Competition**

6   54.   During trial, Plaintiff colorably presented arguments for unfair competition under two

7   separate theories: breach of fiduciary duty and trade secret misappropriation.

8   55.   Logiclink's breach of fiduciary duty claim falls within the four-year statute of limitations

9   period provided under Cal.C.C.P. §343, which governs obligations not covered by any

10   other provisions of California codes.

11   56.   Several principles of agency law are relevant to Plaintiff's unfair competition claim under

12   the theories of breach of fiduciary duty:

13   "An agent has a fiduciary duty to act loyally for the principal's benefit in all matters

14   connected with the agency relationship."  Restatement (Third) of Agency § 8.01 (2006).

15   "Although an agent's interests are often concurrent with those of the principal, the general

16   fiduciary principle requires that the agent subordinate the agent's interests to those of the

17   principal and place the principal's interests first as to matters connected with the agency

18   relationship."   Restatement (Third) of Agency § 8.01(Comment b) (2006).

19   "An agent has a duty, within the scope of the agency relationship, to act reasonably and to

20   refrain from conduct that is likely to damage the principal's enterprise."  Restatement

21   (Third) of Agency § 8.10 (2006).

22   "An agent has a duty to use reasonable effort to provide the principal with facts that the

23   agent knows, has reason to know, or should know when (1) subject to any manifestation

24   by the principal, the agent knows or has reason to know that the principal would wish to

25   have the facts or the facts are material to the agent's duties to the principal; and (2) the

26   facts can be provided to the principal without violating a superior duty owed by the agent

27   to another person."  Restatement (Third) of Agency § 8.10 (2006).

28   57.   Basulto breached his fiduciary duty to Logiclink during his employment at Logiclink.

13

58. Basulto took business opportunities for himself and Keylink, while he was employed by Logiclink, by suppressing customer complaints about Logiclink's system and endeavoring to obtain potential Logiclink customers for himself and Keylink.  TT 1/8/09, 92:5-113:25; TT 1/14/09, Parker Vol.I, 77:3-79:24; TT 1/6/09, Beesley, 33:14 - 34:6; Trial Exhibits 5, 86 &87.

59. Basulto competed with Logiclink during his employment at Logiclink by obtaining information on hotels that would otherwise contract with Logiclink and dissuading several hotels in the Las Vegas area from committing to a multi-year contract with Logiclink (in hopes of obtaining those hotels as Keylink customers).  TT 1/14/09, Parker Vol.I, 10:4 - 14:2; Trial Exhibits 7, 10-15, 20-22 & 51-77.

60. Basulto successfully diverted many potential and former Logiclink clients while employed by Logiclink.  TT 1/8/09, 92:5 -113:25; TT 1/14/09, Parker Vol.I, 77:3-79:24.

61. Basulto deceived Logiclink by not disclosing to Logiclink that several potential clients, such as the Treasure Island Hotel, were dissatisfied with Logiclink's predecessor's system and, therefore, did not want to install Logiclink's kiosk systems.  Basulto also gave Logiclink false assurances that potential clients such as Treasure Island were interested in signing a Logiclink contract when they were not.  TT 1/14/09, Parker Vol.I, 77:3-79:24.

62. As part of his employment with Logiclink, Basulto signed a Non-Disclosure and Confidentiality Agreement that states in part: "The undersigned hereby agrees not [sic] interact or interface with any competitors or competitive companies without the expressed written pre-approval by the upper management of Logiclink."  Trial Exhibits 4-5.

63. Under Cal.Bus. & Prof.Code §  West's Ann.Cal.Bus. & Prof.Code § 16600 *et seq*, contracts not to compete are void (subject to certain limited exceptions).

64. Regardless of whether the Non-Disclosure and Confidentiality Agreement signed by Basulto was void, Basulto is liable under general principles of agency law for breaching his fiduciary duty to Logiclink while in its employ.

65. When Basulto left Logiclink he took Logiclink's confidential customer list with him.

66. Logiclink has not proven that its confidential customer list was a trade secret.

14

67.  Logiclink has also not proven that its business proposals or contracts were proprietary.

68.  Plaintiff has not proven unfair competition under any theory other than breach of a fiduciary duty.

**Unjust Enrichment**

69.  Unjust enrichment is an equitable principle that allows for the disgorgement of unjustly earned profits.  *See e.g., McBride v. Boughton*, 123 Cal.App.4th 379 (2004); *Paracor Financial, Inc. v. General Electric*, 96 F.3d 1151, 1167 (9th Cir. 1996).

70.  Damages may be awarded under the principle of unjust enrichment where there was a "receipt of a benefit and unjust retention of the benefit at the expense of another." *Lectrodryer v. SeoulBank*, 77 Cal.App.4th 723, 726 (2000).

71.  Under Restatement (Second) of Agency § 403, "If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal." This rule applies where the agent makes a profit from competing with the principal. See Restatement (Second) of Agency § 403 Comment a.

72.  Basulto was unjustly enriched in the amount of $72,272.67, consisting of wages, commissions and expense reimbursements from Logiclink while Basulto was actually working for his own personal benefit in an attempt to divert several hotels (*i.e.*, Treasure Island, Mandelay Bay, New York New York, Stratosphere, Flamingo HGVC, Flamingo Hotel, Hilton HGVC No. 2, Monte Carlo, Golden nugget, MGM Signature, Belagio, Harrah's Laughlin and Riveria) – as opposed to working for the benefit of Logiclink.

73.  Logiclink argues that it is also entitled to damages in the amount of $1,989,000 for loss of business profits; $5,293,000 for loss of future earnings over the next five years (discounted to their present value); and $837,001 for loss of future royalties over the next five years.  Logiclink has not proven that said losses may be directly attributed to Basulto's breach of his fiduciary duty to Logiclink during his employment at Logiclink. Any award of damages for such losses would be speculative as no evidence has been put forth proving that Keylink took business opportunities that would definitely have gone to

1    Logiclink but for Basulto's breach of his fiduciary duties while employed at Logiclink.

2    Speculative damages are not sustainable.  *See, e.g., Service Employees Intern. Union,*

3    *Local 250 v. Colcord*, 160 Cal.App.4th 362 (2008).

4    **Lanham Acts Violations**

5    74.    Under 15 U.S.C. §1051 *et seq* (the "Lanham Act") it is illegal to dilute or infringe

6            trademarks.

7    75.    Defendants have not proven that Logiclink diluted or infringed any trademarks held by

8            Keylink or Basulto.

9    **Clayton and Sherman Acts Violations**

10   76.    It is illegal to restrict trade or commerce in violation of the Sherman Act (15 U.S.C. §1 *et*

11           *seq*.) or the Clayton Act of 1914 (15 U.S.C. §12 *et seq*.).  Both the Sherman Act and the

12           Clayton Act require some contract or agreement between parties to lessen competition or

13           create a monology.  No evidence has been presented proving that Logiclink acted – either

14           on its own or in collusion with others – to create a monopoly or to lessen competition.

15   77.    Logiclink did not violate any anti-trust laws.

16   **Interference With Contract, Interference With Prospective Economic Advantage, and**

17   **Defamation in the Marketplace**

18   78.    In its February 2, 2009 briefing, Defendants themselves stated: "The facts set forth [] with

19           respect to the letters that were sent to [potential customers of Keylink], as reported by Mr.

20           Kao, constitute an attempted interference with existing contracts and prospective

21           economic advantage.  However, defendant did not prove any particular defamatory

22           statement nor any measurable economic damage arising from those acts."  Keylink clearly

23           failed to prove that Logiclink  interfered with a prospective economic advantage,

24           interfered with contracts or committed a civil wrong of trade defamation pursuant to the

25           laws of the State of California, Nevada, and Common Law.  Indeed, Defendants withdrew

26           their defamation claim outright during their closing argument.

27   **Laches Defense**

28   79.    The doctrine of laches is the "neglect or delay in bringing suit which causes prejudice to

1   the adverse party." *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 22

2   U.S.P.Q.2d 1321, 1325 (Fed. Cir. 1992)(outlining the laches defense in the patent

3   infringement context). In order to succeed on a laches defense in the patent infringement

4   context, defendant must generally prove that (1) the plaintiff's delay in bringing suit was

5   unreasonable and inexcusable and (2) because of the delay, the defendant suffered

6   material prejudice. *Id.* However, "[i]n suits for unfair competition or infringement mere

7   laches in the sense of delay to bring suit does not constitute a defense." *Hall v. Holstrom*,

8   106 Cal. App. 563, 571 (1930)(citing *Nolan Bros. Shoe Co. v. Nolan*, 131 Cal. 271

9   (1901)).

10  80.   Defendants have not proven that Logiclink unreasonably or inexcusably delayed bringing

11        the instant lawsuit or that Defendants have suffered a material prejudice as a result of the

12        timing of the instant lawsuit.

13  **Unclean Hands Defense**

14  81.   Unclean hands is an equitable defense which provides that a party seeking equitable relief

15        from the Court must have acted equitably in the transaction giving rise to its claim.

16        *Fladeboe v. American Isuzu Motors, Inc*., 150 Cal. App. 4th 42, 56 (2007)(citations

17        omitted). "The doctrine of unclean hands requires unconscionable, bad faith, or

18        inequitable conduct by the plaintiff in connection with the matter in controversy." *Id.*

19        (citations omitted)(emphasis added).

20  82.   Defendants have not proven that Logiclink acted in bad faith, inequitably, or in an

21        unconscionable manner, such that relief from Basulto for unjust enrichment would be

22        inappropriate.

23  **Rule 11 Sanctions**

24  83.   Defendants now request that the Court grant Rule 11 Sanctions against Plaintiff, without

25        providing any separate noticed motion, as required by the U.S. Constitution's Due

26        Process Clause and Fed. R. Civ. P. 11(c)(2) ("A motion for sanctions must be made

27        separately from any other motion and must describe the specific conduct that allegedly

28        violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or

be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.").

84. The Court is unable to consider Defendants' request for Rule 11 Sanctions before receiving a Noticed Motion for Sanctions.

## DISPOSITION

85. If any of the foregoing Findings of Fact are also Conclusions of Law, they are incorporated in the above Conclusions of Law.  If any of the foregoing Conclusions of Law are also Findings of Fact, they are incorporated in the above Findings of Fact.

86. Each Conclusion of Law is severable from each and every other Conclusion of Law.

87. Plaintiff has failed to meet its burden of proof against both Defendants on its claim of patent infringement.

88. Plaintiff has met its burden of proof against both Defendants on its claims of unfair competition and unjust enrichment.

89. Defendants have failed to meet their burden of proof on their defenses of laches and unclean hands.

90. Defendants' defenses pertaining to patent invalidity and unenforceability are moot.

91. Defendants have failed to meet their burden of proof on their counterclaims of interference with an existing contractual relationship, interference with prospective economic advantage, trade defamation, Lanham Act violations, Clayton Act violations and Sherman Act violations.

92. Plaintiff is awarded $72,273.00 in unjust enrichment from Basulto.

93. All parties shall bear their own costs and attorneys' fees.

IT IS SO ORDERED.

DATED:  March 19, 2009

_David O. Carter_
_____
DAVID O. CARTER
United States District Judge